**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES,

     -against-

           **19-CR-889 (AJN)**

MICHAEL GOLISZESKI,
              *Defendant.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### SENTENCING MEMORANDUM OF MICHAEL GOLISZESKI

GELBER & SANTILLO PLLC

Kristen M. Santillo, Esq.
Fern Mechlowitz, Esq.
347 W. 36th Street, Suite 805
New York, NY 10018
Phone: 212-227-4743
Email: ksantillo@gelbersantillo.com

## I. Introduction

On June 25, 2020, Michael Goliszeski, a first-time offender at age 69, will be sentenced by this Court for conspiracy to commit mail fraud arising out of his role in creating fictitious and inflated invoices during his employment as a property manager with Rexton Realty Company.

As letters from Mr. Goliszeski's family, friends and his therapist show, Mr. Goliszeski's offense conduct is out of character for a man who escaped a childhood marred by physical and psychological abuse, parental alcoholism and financial distress to achieve success through hard work and skilled manual labor.  Perhaps Mr. Goliszeski's most defining characteristics, though, are his uncommon devotion to his family, including his adopted daughters, his daughter, his stepdaughter and his autistic grandson, and his kindness and generosity toward his partner, his friends and his community.  These attributes, more than Mr. Goliszeski's aberrant conduct in committing this offense, define his character.

For the past 18 months, Mr. Goliszeski has been consumed with deep remorse for his conduct. ███████████████████████████████████.  He has been grappling with how far he deviated from his core values in regular therapy sessions, and has been focused on how he can learn from his mistakes and become a better person.  Although his family and friends are fiercely devoted to him and will forever stand by him, Mr. Goliszeski has been overcome with shame that he disappointed them.

Mr. Goliszeski has also gone to extraordinary lengths to make amends.  He entered into a civil settlement with Rexton, pursuant to which he paid back ███████ and will pay an additional $137,426.23 in restitution at sentencing.  He had to liquidate nearly all of his assets to

do so, including draining his retirement accounts at a time when his productive working years are dwindling, and selling his beloved home of 15 years, where he raised his step-daughter.

Whereas Mr. Goliszeski previously managed several first-class commercial buildings in New York City for Rexton, he now works as a part-time janitor at a local church in New Jersey. While he is grateful for his new job and has found contentment working with his hands and contributing to the church community, he has undoubtedly suffered a tremendous professional setback late in life, from which he will never recover.  In sum, Mr. Goliszeski has already paid a high price, psychologically, financially and professionally, for his crime.

Mr. Goliszeski's Guidelines range is 33-41 months imprisonment.  Probation has recommended a variance below the Guidelines to a term of 18 months imprisonment, based on Mr. Goliszeski's restitution to Rexton, his combat deployment in Vietnam, during which he was injured, his steady work history, his heretofore unblemished record, his strong support network, his advanced age and his anxiety.  While we agree that a below-Guidelines sentence is warranted, we urge the Court to vary even further below the Guidelines and impose a non-custodial sentence.  Due to Mr. Goliszeski's advanced age, he would be at great risk of contracting life-threatening complications from COVID-19 if he is incarcerated anytime in the foreseeable future.  In light of the restitution Mr. Goliszeski has paid, the psychological, financial and reputational harm he has already suffered due to his crime, the honorable life he has otherwise led, and his strong family support, a non-custodial sentence is sufficient but not greater than necessary to achieve the aims of sentencing.

## II. Personal Background

### a. Mr. Goliszeski's Troubled Childhood

Mr. Goliszeski was born on Long Island in 1951, and is the oldest child of his father, Anthony John Goliszeski, and his mother, Patricia Marie Grott.  PSR ¶ 42.  He has two younger brothers, Anthony and James.  Mr. Goliszeski's father was an alcoholic who physically and emotionally abused his wife and the children.  Mr. Goliszeski, as the oldest child, bore the responsibility of caring for his younger siblings while his parents worked and protecting his siblings and his mother from his father's rages.

Due to his father's alcoholism and a gambling addiction, Mr. Goliszeski's family struggled financially when he was young, and his family relied upon welfare to survive.  In addition to the constant fear and material deprivation that came with growing up the son of an abusive alcoholic, Mr. Goliszeski was deeply ashamed, as the entire neighborhood was aware of his father's drunken and violent episodes.  When Mr. Goliszeski was just 13 years old, he summoned the courage to confront his father with a knife to protect his mother as his father attacked.  After this incident, Mr. Goliszeski's father never returned to the home, abandoning the family, emotionally and financially.

Mr. Goliszeski worked from a young age to help provide for the family, taking jobs including delivering newspapers and bagging groceries.  As a testament to his resourcefulness, Mr. Goliszeski, who knew he could never afford a car any other way, gathered all the materials and built his own car from scratch when he was a teenager.  In a role that would continue throughout his life, Mr. Goliszeski also served as a makeshift father figure to his younger brothers.

3

### b.   Mr. Goliszeski Joins the Military

Mr. Goliszeski attended the Automotive High School in Brooklyn, New York, but left in the tenth grade to join the Navy.  PSR ¶ 63.  When the Vietnam War was raging and others were dodging the draft, Mr. Goliszeski enlisted in the Navy when he was just 17 years old and left for boot camp on February 28, 1969, less than a month after he turned 18.  He wanted to serve his country but also viewed this as his best option to leave behind the poverty and shame of his childhood and experience the world beyond his insular neighborhood in Sunnyside, Queens.  Mr. Goliszeski explained this formative experience of serving in the Navy by stating:  "I was taught discipline, respect, camaraderie, skills to work with my hands and my mind."  Exhibit C-1.

While serving aboard an aircraft carrier in 1970 during a combat deployment, Mr. Goliszeski was injured when he was hit with debris from a naval aircraft on the flight deck.  He suffered a broken jaw, nose, and cheekbone, along with numerous lacerations.  He returned to California to recuperate, and was thereafter honorably discharged.  For his service, Mr. Goliszeski was awarded the National Defense Medal, the Vietnam Service Medal, and the Vietnam Campaign Medal.

### c.   Post-Military Employment

The Navy opened up the world to Mr. Goliszeski, as it was the first time he flew on a plane and traveled the world.  Mr. Goliszeski fell in love with California while he recuperated there, and longed to say.  Nonetheless, after he was discharged, Mr. Goliszeski was drawn back home to New York out of a sense of familial obligation.  During his deployment, his mother had developed a debilitating alcohol addiction, and he felt a duty to return to help his mother and his younger brothers.  As his stepdaughter Alix explains, "Mike is and always has been a caretaker.

4

He views himself as having the responsibility for caring for all those around him, and this is his kryptonite." Exhibit B-2.

Mr. Goliszeski became an auto mechanic and received his GED in 1973. Thereafter Mr. Goliszeski found work as a superintendent and then property manager, first for Adams & Co. Real Estate and then for Rexton Realty, discussed more fully below.

### d. Mr. Goliszeski's Role as an Exceptionally Devoted Father and Father-Figure

The most important and defining role Mr. Goliszeski has played has been as a father and father-figure to his children, adopted children, stepdaughter, grandchild and many others whom he has taken under his wing.

Mr. Goliszeski married Sharon Farrar in 1974. When they were married, Ms. Farrar already had two children, Jodie and Lisa, from a prior relationship. Ms. Farrar suffered from such severe alcoholism and mental illness that she would sometimes not leave the house for weeks at a time, and Mr. Goliszeski was left to work, pay the bills and care for the girls. Due to Ms. Farrar's alcoholism and mental health struggles, Mr. Goliszeski's marriage to Ms. Farrar was tumultuous. They divorced, remarried and then divorced again in 1998. While Mr. Goliszeski's relationship with Ms. Farrar was troubled, Mr. Goliszeski was devoted to Jodie and Lisa. He adopted them and raised them as his own children. Ms. Farrar and Mr. Goliszeski also had their own daughter, Christa.

Mr. Goliszeski was so devoted to Jodie and Lisa that his biological daughter, Christa, did not discover that Jodie and Lisa were not his biological daughters until recently. She writes:

> A few years ago I found out that my two older sisters are not my biological sisters, but half-sisters. My father at a young age took responsibility of two little girls and adopted them. He has provided, guided, cared and loved them ever since. When I found this out my love and respect for my father grew even more. Here was a man who took on

responsibility for two children that were not even his own, but became his own.  Exhibit B-8.

When Mr. Goliszeski's marriage to Ms. Farrar finally ended, Jodie and Lisa had already left the home, but Mr. Goliszeski raised Christa, who was an adolescent, as a single father.  After the divorce, Christa's mom was absent from her life, but Mr. Goliszeski filled the void.  He devoted countless hours to coaching Christa's sports' teams.  Christa and Mr. Goliszeski remain exceptionally close to this day.  She has explained that "[m]y father is my supporter, my best friend, my rock, my heart, and my inspiration.  He is the one person I can always count on.  I start my day with a call to my father and I end my day with a text."  Exhibit B-8.

Mr. Goliszeski has also been a father figure to his nephew, Michael.  Michael writes that Mr. Goliszeski, "taught me so many things growing up from chess to how to fix a leaky faucet.  But most importantly, he taught me how to love, respect and care for others."  Exhibit B-10.  His nephew notes that Mr. Goliszeski was "not just a role model to me, but to many of my friends as well.  In college, he was a mentor to many of them.  And to this day, when I see them, they still ask about Uncle Mike."  Exhibit B-10.

Mr. Goliszeski is also exceptionally devoted to his grandson, Nicholas, who is autistic.  Mr. Goliszeski was one of the first people to observe that Nicholas displayed signs of autism.  Mr. Goliszeski extensively researched autism and sought out enrichment opportunities for Nicholas.  He advocated for early intervention for Nicholas even as Nicholas's parents were in denial that he was struggling.  As his friend Linda Gelfand explains, Mr. Goliszeski "spends countless hours taking him to appropriate activities to enrich his life and provide some respite for his daughter.  Additionally Michael has attended many fund raising events to raise money for the Autistic community."  Exhibit B-12-13.

Mr. Goliszeski has been in a relationship with Marilee Bleestein, now age 74, since 2007. They met at Rexton, where Ms. Bleestein was a bookkeeper. Mr. Goliszeski is very close with Ms. Bleestein's daughters and her grandchildren. He has taken on the role of a second father to Ms. Bleestein's daughter, Alix, who was raised in his home since she was nine years old. In her letter to the Court, Alix has explained the numerous big and small ways Mr. Goliszeski has supported her. Exhibit B-1-4. ███████████████████████████

████████████████████████████████████████████████████

███████████████████████████ Exhibit B-3.

When he was working at Rexton, Mr. Goliszeski took three young men, Brian Elder, Marvin Brown and Dominic Vasquez, under his wing. Mr. Goliszeski hired Mr. Elder and taught him all aspects of the property management business. Mr. Brown was a teenager when Mr. Goliszeski first hired him, and he suffered from schizophrenia. Despite his erratic behavior, Mr. Goliszeski would work with him to find suitable, fulfilling work, in a mentoring relationship that lasted for years. Mr. Goliszeski hired Dominic Vasquez as an elevator operator, and went out of his way to teach him all the skills he needed to rise to the level of superintendent.

Mr. Goliszeski has become a father figure to Jeffrey Conway, his daughter Christa's boyfriend. In addition to offering him fatherly advice, Mr. Goliszeski helped sell his home, and assisted him with various projects including installing ceiling fans, building a firepit and teaching him how to install an electrical outlet. Exhibit B-14. Mr. Conway notes that, before he met Mr. Goliszeski: "I never had a father figure around in my life to help with projects or to give advice. To me Mr. Goliszeski is my family, he always goes above and beyond to help me in any way he

can.  He is one the genuinely nicest, loving people I know next to my own Mother."  Exhibit B-14.

Mr. Goliszeski's commitment to his children, and to multiple others he has taken under his wing, is an exceptional aspect of his character that warrants leniency.

**e.  Mr. Goliszeski's Commitment to His Church, His Friends and His Community**

Mr. Goliszeski not only works at the Tower Hill Presbyterian Church as a part-time custodian, but he volunteers his time there when he is not working.  He volunteers at the food bank and at the senior lunch.

Mr. Goliszeski is also exceptionally giving of his time and his skills to friends.  When a widowed friend needed assistance selling her home, Mr. Goliszeski stepped in and "assisted with needed repairs, painting, and the cleaning of unwanted items.  He expected and received no compensation."  Exhibit B-13.  With his help, the home sold in weeks.  Mr. Goliszeski also used his skills to help his friend, Richard Toledo, rebuild his motel after it was devastated by a hurricane.  Exhibit B-16.

Mr. Goliszeski is also always willing to help his friends, neighbors and even strangers. Mr. Toledo notes that Mr. Goliszeski has gone out of his way to help those in need find jobs. Exhibit B-16.  Mr. Goliszeski's friend, Rochelle Lerch, also notes that when her son was struggling with psychological issues, Mr. Goliszeski offered him a job.  Exhibit B-17.

**f.  The Offense Conduct, and Mr. Goliszeski's Extensive Efforts to Make Amends**

Mr. Goliszeski's offense arises out of his employment with Rexton Realty Company. Rexton is a part of multibillion dollar real estate portfolio.  For nearly two decades, Mr.

Goliszeski served as the property manager of several Rexton real estate buildings. During that time, Mr. Goliszeski oversaw several million dollars worth of tenant leasehold work and ambitious capital improvement projects such as building facade repairs, passenger elevator modernization projects, and other improvements necessary to maintain a functional and profitable portfolio.

While Mr. Goliszeski prided himself on maintaining high standards for himself and the workers at the buildings and running the buildings like well-oiled machines, he also regretfully used his position as the property manager to enrich himself. Mr. Goliszeski would use his own companies and workers to perform work at the buildings, and, at times, he created invoices for these companies for work that had not been done, or inflated the amount of work that had been done.

When Mr. Goliszeski's conduct was discovered and he was confronted by the company, he quickly acknowledged his misconduct and did everything in his power to make amends. He entered into a substantial civil settlement ███████ with Rexton, and liquidated nearly all of his assets to pay the settlement. This included property to which he was emotionally attached, including his home of 15 years. This also included draining his retirement accounts at age 69, when he will have little chance to replenish them.

Mr. Goliszeski also quickly entered into a plea agreement with the U.S. Attorney's Office pre-indictment, taking full responsibility for his actions without putting the government to its

burden of proving his case.[1]  At the time of sentencing, he will also pay an additional $137,

426.23 in restitution.

### g.  Mr. Goliszeksi's Mental Health Struggles

Mr. Goliszeski's deep shame and regret for his conduct has taken a tremendous toll on his

mental health.  He has been so distraught that he has contemplated taking his own life.  Mr.

Goliszeski has been attending regular therapy sessions with Dr. Sireesha Kolli since 2015 to treat

his longstanding depression and anxiety, but his symptoms have worsened.[2]

Dr. Kolli notes that:



---

[1] While Mr. Goliszeski has taken full responsibility for his actions, there are aspects of the
statements given by Peter Harris and Steven Leader on behalf of Rexton that overstate the
offense conduct and the losses that followed.  Mr. Harris notes that Mr. Goliszeski was
responsible for stealing over $4.8 million.  Neither Mr. Harris nor Mr. Leader have provided any
basis for their calculations, which substantially overstate any losses from Mr. Goliszeski's
conduct.  If these estimates were properly before the Court, Mr. Goliszeski would be in a
position to vigorously challenge them.  After extensive negotiations, Mr. Goliszeski and Rexton
reached a ▇▇▇▇▇▇ civil settlement that more closely approximates the loss amount in this
case, and this corresponds to the loss amount to which Mr. Goliszeski stipulated with the
Government in his plea agreement.  *See* PSR ¶ 27 (loss amount of $1,873,426.23).  We urge the
Court to rely upon this stipulated figure, rather than the additional amounts alleged by Mr.
Leader and Mr. Harris which have not been substantiated.  To be clear, Mr. Goliszeski
recognizes that even the stipulated amounts of loss were substantial and unacceptable.  That is
why he has taken full responsibility for those amounts by paying the company back in full.  But
we urge the Court to disregard the additional unsubstantiated dollar amounts referenced by Mr.
Harris and Mr. Leader.  Mr. Goliszeski also disputes that he ever hid his relationship with Ms.
Bleestein from anyone.  Rexton did not have a no-fraternization policy at the company, and
indeed others in the company employed their significant others.  Additionally, the relationship
with Ms. Bleestein and Mr. Goliszeski was open and conspicuous.

[2] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



Exhibit A-1.

In what is most painful to him, Mr. Goliszeski's family has also suffered mental health side effects from his involvement in the offense.  Ms. Bleestein notes that, Mr. Goliszeski's legal troubles:  "took at toll on both of us.  We both went into a deep depression and anxiety.  ▮ ▮" Exhibit B-6.  His daughter Christa notes: ▮  Exhibit B-9.

## III.   The 3553 Factors Warrant a Lenient Sentence

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).  Pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), this Court must impose a sentence "sufficient, but not greater than necessary," to achieve the objectives of sentencing, specifically with regard to the factors set forth at § 3553(a).  Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from future crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner; (4) the kinds of sentences available, and the sentencing range and applicable policy statements; (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the offense.  In Mr. Goliszeski's case, these factors strongly favor a non-custodial sentence.

### a. Mr. Goliszeski's History and Characteristics Warrant a Non-Custodial Sentence

Mr. Goliszeski's history and characteristics warrant a non-custodial sentence.  At 69 years old, this is a first-time offense and Mr. Goliszeski's conduct was out of character for him, as he has otherwise devoted the vast majority of his life to hard work and caring for others in trying circumstances.

From the time that he was a child, Mr. Goliszeski placed the needs of others ahead of his own.  At just 13 years old, he risked physical harm to confront his abusive father and protect his mother and younger brothers.  As a teenager, he worked multiple jobs to put food on the table for his family.  He enlisted in the Navy at 17 and was injured, sacrificing his safety to protect our country.  When he finally experienced freedom as a young man discharged from the Navy and living in California, he sacrificed the promising new life that was at his fingertips to return home to care for his struggling mother and his younger brothers.

Despite a troubled marriage, Mr. Goliszeski adopted his wife's two young daughters and raised them as his own, providing stability and support for young girls with a mother who suffered from mental illness and alcoholism.  He also raised his biological daughter as a single father when it became clear that her mother was not capable of caring for the child, and continues to play the role of mother, father and best friend.

Mr. Goliszeski was sensitive and caring enough to observe and help diagnose his grandson with autism, and to track down any available resources to assist his grandson to grow and thrive, even when his parents were in denial and resisted Mr. Goliszeski's assistance. Similarly Mr. Goliszeski became a second father to Ms. Bleestein's daughter, Alix, and gave her emotional support ████████████████████████████████████████████ ████████████

Mr. Goliszeski is also always available for his partner of 15 years, Marilee Bleestein, who is 74 years old and suffers from a number of health ailments, ███████████████ ██████████████████████████████████ He protects her, takes her to medical appointments and supports her emotionally and financially in any way he can. As Marilee attests, her "emotional and physical health depend on Mike's presence." Exhibit B-6.

Mr. Goliszeski has also been exceptionally generous in sharing his skills with his friends, family and neighbors. As just examples, he used his skills as a craftsman to reconstruct his friend's property following a hurricane, and he fixed a widower's house so that she could move out and move past her grief. He has also mentored his nephew and countless others. He regularly volunteers at his church and takes great pride in contributing to the church community with his skills as a craftsman.

Dr. Kolli, who has gotten to know Mr. Goliszeski in well over five years of therapy, explains that: "Michael has always struck me as a loving father, a devoted partner, a hard-worker, and a kind man." Exhibit A-1. She notes: "I have seen over 1,500 patients in my time in practice over the last decade, Michael stands out in his level of introspection, desire to self-improve, and his pre-existing foundation of kindness and generosity." Exhibit A-2.

These aspects of Mr. Goliszeski's deep-rooted and longstanding character warrant leniency.

**b.  The Nature and Circumstances of the Offense Warrant a Non-Custodial Sentence**

Mr. Goliszeski's offense is undoubtedly serious, as over the course of several years, he diverted $1,837,426.23 to his own businesses during the course of his employment at Rexton for work that was either not done or for which the invoices were inflated.  He deeply regrets that he violated the trust of his employer in doing this.  Nonetheless, this is a non-violent crime, which is Mr. Goliszeski's only criminal offense in his 69 years.  Mr. Goliszeski quickly accepted responsibility for his crime, civilly and criminally, and he will have paid back all of the restitution owed to his corporate employer at the time of sentencing.  Considering the nature and circumstances of the offense, a non-custodial sentence is warranted.

**c.  A Non-Custodial Sentence is Sufficient to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, to Afford Adequate Deterrence, and to Protect the Public From Future Crimes of Mr. Goliszeski**

A non-custodial sentence would be sufficient but not greater than necessary to reflect the seriousness of Mr. Goliszeski's offense, promote respect for the law, provide just punishment for the offense, deter future crimes and protect the public from Mr. Goliszeski.  Mr. Goliszeski has already suffered acute psychological distress as he has grappled with his involvement in the offense.  His preexisting depression and anxiety has been exacerbated, and he has contemplated suicide.  He has gone to great lengths to address the root causes of his wrongdoing in therapy, and he has worked diligently to become a better person with the aid of his therapist.  The sustained hard work and introspection Mr. Goliszeski has done with his therapist fulfills any

14

rehabilitative goals of a custodial sentence.  If Mr. Goliszeski were to receive a non-custodial sentence, he could also continue his productive therapy with Dr. Kolli, ensuring that he will not make the same mistakes again.

Mr. Goliszeski has paid back the money he took from Rexton, at a great financial and emotional cost.  He paid exorbitant penalties to drain his retirement accounts to pay for restitution.  He sold the home he lived in for the longest period in his life, which was the cherished childhood home of a stepdaughter he loves.  He now faces great financial uncertainty during his golden years.

Mr. Goliszeski also lost a career that he had been building his entire life, in which he took great pride.  Whereas Mr. Goliszeski held a prestigious job as a property manager of a multibillion-dollar real estate company, he now works as a part-time custodian at a local church for close to minimum wage.  The psychological, financial and reputational price Mr. Goliszeski has paid for his crime has impressed upon him the seriousness of his conduct, and, along with a non-custodial sentence, would provide sufficient punishment for his crimes, protect the public and deter him from committing future crimes.

### d. Due to the COVID-19 Pandemic and Mr. Goliszeski's Advanced Age, a Custodial Sentence Anytime in the Foreseeable Future Could Be Life Threatening

A non-custodial sentence is also warranted because the Bureau of Prisons is incapable of protecting Mr. Goliszeski's health and providing him with adequate medical care.  *See* 18 U.S.C. § 3553(a)(2)(D).  Mr. Goliszeski is 69 years old, which puts him at high risk for severe illness or death from COVID-19 if he is exposed to the virus.  *See* CDC Guidance, available at

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-

risk.html#people-aged-65%20years-and-older ("Older adults, 65 years and older, are at higher

risk for severe illness and death from COVID-19.")  In fact, 80% of deaths reported in the United

States from COVID-19 have been in adults age 65 years and older.  *Id*.  As the CDC explains,

"[t]he immune systems of older adults weaken with age, making it harder to fight off infections."

*Id*.

       Due to the inability to social distance and practice proper hygiene in prisons, Mr.

Goliszeski is at high risk for contracting COVID-19 if he is sentenced to a custodial term.  The

best defense against COVID-19 is avoiding contracting the virus, but "[t]he stark reality is that

'avoiding exposure to COVID-19 is impossible for most detainees and inmates.'" *Durel B. v.

Decker*, Civ. No. 20-3430 (KM), 2020 WL 1922140, at *2 (D.N.J. Apr. 21, 2020).  Since a

custodial sentence would dramatically increase Mr. Goliszeski's chance of contracting COVID-

19 and he is in a high risk category that would make any complications from COVID-19

potentially life threatening, a custodial sentence would not adequately protect his health.

       Additionally, were Mr. Goliszeski to get sick in custody, the BOP could not provide

adequate care.  The BOP has proven unable to provide effective medical care for people like Mr.

Goliszeski even in ordinary times.  In 2016, DOJ's Office of Inspector General ("OIG") found

that the BOP experienced chronic medical staffing shortages and failed to take adequate

measures to address them, endangering the safety and security of its institutions.  *See, e.g.,* U.S.

Dep't of Justice Office of the Inspector Gen., Review of the Federal Bureau of Prisons' Medical

Staffing Challenges i-ii, 1-2 (Mar. 2016), available at

https://oig.justice.gov/reports/2016/e1602.pdf.  From 2010 to 2014, the BOP's total medical staff

was "approximately 17 percent less than what the BOP projected was necessary to provide what

it considers to be 'ideal' care," and 12 institutions were so medically understaffed that they were described as "crisis level." *Id*. at 1. Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards,[3] and has made wait times for individuals to receive even routine medical care unacceptably long. *See* U.S. Dep't of Justice, Office of the Inspector Gen., The Impact of an Aging Inmate Population on the Federal Bureau of Prisons 17-19 (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf ("Aging Inmate Population").

The BOP's inability to care for aging individuals, like Mr. Goliszeski, is well-documented and concerning. According to the OIG, even before COVID-19, the BOP lacked appropriate staffing levels and infrastructure to meet the needs of aging individuals. *See* Aging Inmate Population, at i-ii. People like Mr. Goliszeski could wait years for even routine medical needs. *Id*. at 17-19. Because Mr. Goliszeski's advanced age places him at particularly high-risk for severe complications if he were to contract COVID-19, the need for effective medical care to maintain his health is all the more critical.

Unfortunately, as COVID-19 ravages its facilities, the BOP's ability to provide effective medical care has only gotten worse.[4] Because the BOP has failed to implement large-scale

---

[3] *See* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice News (Mar. 24, 2020), https://bit.ly/3eq7Rl7; *see also* Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 3-4 (2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2ZJlDeG.

[4] *See, e.g.,* Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc-2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-18, at 7 (Declaration of Dr. Chris Beyrer) ("BOP's actions (or inaction) fail to follow the most basic infection control measures" in FCC Butner); Complaint, *Wilson v. Ponce*, No. 20-cv-4451 (C.D. Cal. May 16, 2020), ECF No. 1, at 99 (Declaration of Shamsher Samra, MD) ("it is questionable whether the healthcare system at Terminal Island is even capable of responding to the dire situation it now faces"); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Not only is MDC [Brooklyn] ill-equipped to identify cases of COVID-19 within its population, but it has not implemented adequate infection control practices. In fact, it is my assessment that several current practices in MDC actually promote a more rapid spread of COVID-19. . .").

testing, it cannot effectively identify and isolate people with the virus from those who are

healthy.  Testing capabilities vary from facility to facility and the BOP has failed to implement a

testing and isolation protocol for its staff.[5]  In at least one facility, the virus is so prevalent that

the BOP has stopped testing altogether and instead declared all individuals to be presumed-

positive.[6]  The BOP has also failed to provide incarcerated individuals and staff with adequate

personal protective equipment to curb the spread of the virus.[7]  And the BOP's "illogical and self-

defeating" quarantine procedures—which fail to distinguish between the healthy and sick—are

"ungrounded in science, and a danger" to Mr. Goliszeski.  *United States v. Scparta*, No. 18-CR-

578 (AJN), 2020 WL 1910481, at *3 (S.D.N.Y. Apr. 20, 2020).  Since the BOP is incapable of

protecting Mr. Goliszeski from contracting COVID-19, or adequately treating him if he were to

contract the deadly virus, the BOP cannot effectively protect Mr. Goliszeski's health.

Although in some states infection rates from COVID-19 are waning, in many states

COVID-19 infections are still on the rise.  Experts also agree that there is likely to be a second

wave of infections in the fall.  *See* Michael Grothaus, *Will COVID-19 have a second peak? Yes,

and WHO warns it could come sooner than you think*, dated May 26, 2020, available at

https://www.msn.com/en-us/travel/news/will-covid-19-have-a-second-peak-yes-and-who-warns-

---

[5] Luke Barr, *Over 5,000 Corrections Officers Have Contracted COVID-19*, ABC News (May 5, 2020), https://abcn.ws/2zlB8hG ("staff are typically tested in the community"); *see also* AFGE, *A BOP Officer Contracted Coronavirus. He was Told to Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA ("The Bureau of Prisons only tested inmates, not staff.").

[6] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus due to 'Sustained Transmission'*, The LENS (Mar. 31, 2020), https://bit.ly/2AbNA3P.

[7] Letter from U.S. Rep. Salud Carbajal, U.S. Sen. Kamala Harris, and U.S. Sen. Dianne Feinstein to Michael Carvajal, Dir. Fed. Bureau of Prisons 1 (Apr. 21, 2020), https://bit.ly/36yB5LK; AFGE, *A BOP Officer Contracted Coronavirus. He was Told to Return to Work ASAP* (May 4, 2020), https://bit.ly/35KSCjA; Michael Balsamo, *Over 70% of Tested Inmates in Federal Prisons have COVID-19*, AP News (Apr. 29, 2020), https://bit.ly/2WNrsEy; James Call, *Correctional Officers File Complaint about Coronavirus at Federal Prison in Tallahassee*, Tallahassee Democrat (Apr. 18, 2020), https://bit.ly/3drQlfD.

it-could-come-sooner-than-you-think/ar-BB14C0jw (noting that "virtually every scientist agrees" that there is likely to be a second wave of infection and that it will most likely occur in the fall). Moreover, even after a second wave in the fall, there are likely to be more waves of infection to follow. *See id.* In addition, experts agree that a vaccine is not likely to become available until mid-2021, and that timeline "would be a huge scientific feat and there are no guarantees it will work," particularly given that vaccines normally take "years, if not decades, to develop." James Gallagher, *Coronavirus vaccine: When will we have one?*, BBC News, May 18, 2020, available at https://www.bbc.com/news/health-51665497. Therefore, the deadly threat of COVID-19 will be present for the foreseeable future. In light of the increased risk Mr. Goliszeski faces as a high-risk individual, a non-custodial sentence is appropriate and necessary to protect him from a potentially catastrophic outcome.

A non-custodial sentence also makes sense from a broader public health perspective. At a time when the BOP, courts, and state authorities are increasingly releasing non-violent offenders from prisons in an effort to reduce the density of the prison population and stem the spread of COVID-19, we respectfully submit that imprisoning an elderly, first-time, non-violent offender like Mr. Goliszeski would run counter to public health policy.

**e. Mr. Goliszeski Has Already Made Full Restitution to Rexton**

While this Court must consider the need to make restitution as a sentencing factor, by the date of sentencing, Mr. Goliszeski will have already fully repaid Rexton, at a great personal cost. The substantial efforts Mr. Goliszeski has undertaken to make Rexton whole warrant further leniency.

## IV.  Conclusion

For these reasons, we respectfully request that Mr. Goliszeski be sentenced to a non-custodial sentence.

Dated: June 18, 2020
          New York, NY

                                        Respectfully Submitted,

                                        /s/ Kristen M. Santillo

                                        Kristen M. Santillo
                                        Gelber & Santillo PLLC
                                        347 West 36th Street, Suite 805
                                        New York, New York 10018
                                        (212) 227-4743

# EXHIBIT A

**A-1**





@kollipsych.com

kollipsych.com

June 11, 2020

To Whom It May Concern:



**A-2**

**KPA**

**KOLLI PSYCHIATRIC**

— & ASSOCIATES —

P: ███████  ☎

F: ███████  🖨

███@kollipsych.com ✉

kollipsych.com 📠





███████████████████████████

Sincerely,

*S Kolli*

Dr. Sireesha Kolli

# EXHIBIT B

Alixandra Bleetstein

May 12, 2020

Honorable Alison J. Nathan, U.S.D.J.
United States Courthouse
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

RE: *United States v. Michael Goliszeski*, 19-cr-889 (AJN)

Dear Judge Nathan,

I write to provide my perspective on Michael Joseph Goliszeski, also known as Mike, and Mikey
G, who has been my unofficial stepfather since 2004.  Mike lives in New Jersey with his life
partner and my mother, Marilee, and our miniature Yorkie, Peaches.  As someone who just
completed her MPH and MSW degrees, I have also taken a keen interest in Mike's life, and I
wish to provide the Court with details I have learned about his life from our long conversations
and my research, which I think shed important light on his character.

Mike grew up in a family with a mother, father, and two younger brothers. Mike's father was a
violent man with an addiction to alcohol who both physically and verbally abused Mike's
mother. Patricia, Mike's mother, kept the home and also worked part-time to help support the
family. Mike's father spent most of the family's money on gambling and alcohol, and so Patricia
was only able to put food on the table with the help of the state, namely through 'welfare'. Mike
and his brothers were raised in the Catholic Church and attended parochial school where Mike
experienced physical and emotional abuse through the use of corporal punishment. Mike's
teachers also frequently humiliated him in front on the class, and he was held back twice.

As soon as he could, Mike began working and has not stopped since. First, he delivered
newspapers in his neighborhood. Then, he bagged groceries. As Mike grew, he was able to make
a living by consistently working any job that would have him. Mike's entrepreneurial spirit can
be perfectly described by the acquisition of his first car. Mike's family was poor, he knew there
was no way he would be able to buy a car, so months before his 16th birthday, Mike started
buying all the car parts necessary and he built his very first car from scratch. I have Mike to
thank for a similar spirit within myself. No matter how ludicrous my side hustles or future plans
may seem, Mike **always** supports me. My own mother often yells at him for usually taking my
side instead of hers when she believes I have not placed my focus in the right arena. When I
begged for a dog, Mike is the one who brought me to the pet store to look (please don't judge us,
this was before we were educated about puppy mills). Before we lost our house, I wanted a
garden, insisted on it really, and so Mike and I went to Lowe's, bought our supplies, and made
the best little garden we could. As I sit here writing this letter to you, Mike is on his way home
from work, but he took a pit stop to the food store for me, because my newest project is baking

homemade bread and Mike calls himself my assistant. Naturally, he says, it is the assistant's job to procure the flour needed for the head baker.

When Mike a teenager, his father had a particularly violent outburst. Mike brought his younger brothers to the back of the house to protect them, but couldn't leave his mother to fend for herself yet again. As we often see with abusive relationships, the survivor of abuse has an extremely hard time leaving their abuser; Mike's mother was the same. As Mike's father was beating his mother, he pushed his father off, told him to get out and never come back, or else. He never came back. This was a pivotal moment for Mike as it's when he decided he needed to leave home and make a better life for himself.

At 17 years old, Mike enlisted with the US Navy, and at 18 he left for boot camp. Mike loved serving in the Navy and still says it was one of the best times in his life. I strongly believe that Mike would have served multiple tours with the Navy if he had not been injured on duty. In a moment of miscommunication, Mike almost had his arm chopped off by the propeller of a plane, and had his nose and cheek bones smashed by a fellow sailor who was saving his life. Mike was sent for medical treatment, was honorably discharged, and was sent home. Though he didn't want to return to the dysfunction that permeated his home life, he felt it was his duty to return to his family. Mike is and has always been a caretaker. He views himself as having the responsibility for caring for all those around him, and this is his kryptonite.

For the next several years, Mike took care of his mother and younger brothers. While one brother was in and out of jail and the other was using drugs, Mike was steadily working and supporting them all. During this time, Mike met his first wife, Sharon. Sharon lived with severe mental illness, sometimes not leaving the house for weeks at a time, and required Mike to take care of her. Mike worked, paid all the bills, and cared for their three girls, Jodie, Lisa, and Christa. Jodie and Lisa are not Mike's children. Mike adopted the girls because they were Sharon's daughters and the two had Christa together. While Mike was unhappy for years, his need to care for others forced him to stay in the marriage. Eventually, Sharon left not only Mike, but also all three girls in his care and disappeared.

Mike began his career in New York City as a doorman, then was promoted to a porter, and then became the superintendent of his building. Eventually, Mike got a job at Rexton Realty Company, where he met my mother. For over 20 years, Mike managed 11 buildings for the company, and continued to help others whenever possible. Both Mike and my mother employed various people at Rexton who others may have considered 'hopeless cases'. John Engel, Rexton's lawyer, requested Mike employ two boys from the Bronx. One of the boys was the Engel's mentee and the other was his best friend. Mike employed the boys, taught them the work, and gave them multiple do-overs when they were not successfully meeting their requirements. Mike and my mother also bought the boys Christmas presents, things for their girlfriends, and the Engel's mentee was on our family phone plan up until 2019. Mike and my mother show their love through charity and gifts, and while it drives me crazy, they really do give out of the goodness of their hearts.

Throughout life, Mike has faced enumerable challenges and has overcome every time. Mike has battled Major Depressive Disorder and anxiety for years, yet he always manages to be friendly

and will welcome you in with a big hug. Mike was my biggest champion when after years of suffering from and hiding my anxiety disorder, I decided I could no longer live that way. My mother and father were appalled when I said I wanted to find a therapist- they didn't understand why I wasn't normal, or what was wrong with me, or how I could be depressed or anxious when they had given me everything this life has to offer. Yet again, Mike was on my side. He tried to explain to both of my parents how therapy might help me, and that if they continued to criticize me for something out of my control, I may never get better. This mental health debate began in 2013 and still continues to this day. ███████████████████████████████████████ ████████████████████████████████████████████████████ Without Mike's constant support, I know I wouldn't be the person I am today.

Mike is a warm-hearted person whose sole purpose in this life has been to provide and care for those most important to him. Mike is one of the hardest working people I know and I have him and my mother to thank for my perseverance and inability to back down when I believe something is wrong (much to my mother's dismay). Mike happily went from working in NYC and managing a multi-billion-dollar business to being a custodian at the church's school where he mops floors and repairs light fixtures. He loves coming home and telling my mom about what the kids said to him that day. His favorite being in this world is our dog Peaches, who he calls his therapist, carries around like a little football, rubs her belly, and gives in to her every demand; and she has many. I wish you could see the way Mike interacts with her, because she brings out all the best parts of him.

As I said, Mike's kryptonite is his need to help his family. Currently, his oldest daughter Jodie is going through a nasty divorce. Mike has handled the entire situation, as he handles all of his kids' problems. He found her a lawyer and is the primary point of contact for the case. Mike's middle daughter Lisa is also addicted to alcohol, and my parents (that's what I call my mom and Mike) have tried helping her get sober for years.

During COVID-19, my parents have had my dad over for dinner 2-3 times a week, every week. My dad will call Mike when he needs help fixing something in his home (he isn't very handy and Mike is exceptionally handy) and Mike will drive over there and help him, without the presence of myself or my mom. Mike and my mom took my dad out to dinner for his birthday and generally include him in things they are doing. Mike often suggests they invite my father to various things, even though we all know my dad is still hopelessly in love with my mom. Yesterday, my dad called my mom on Facetime. Eventually, my mom fell asleep on the couch and I was leaving to go see my friends, but Mike stayed on Facetime talking with my father long after both my mom and I had left the conversation. I have never in my life met another person like Mike.

While I know that what Mike did was wrong, I ask you to please consider Mike's giving heart, his love for his family, my mother, and me while making your decision. Our family has already lost everything except each other, and I don't think we will make it if Mike has to lose his freedom as well. My parents used all of their money to pay the settlement with Rexton. To make this payment, they were forced to sell our home, my childhood home, along with my mom's NYC apartment where I was living and had planned to live until I finished graduate school. ███

███████████████████████████████████████████. If
they had left me like that, I don't know how I could have survived. My parents (all three of
them) are everything to me and my mom and Mike are everything to each other.

I ask that you please strongly consider giving Mike supervised probation, or really anything short
of being sent to prison. Rexton Realty has already received their restitution from my parents at a
great cost to our family. If it would keep Mike out of prison, I am positive our entire family
would complete any number of community service hours or anything else you might request. My
mother won't survive if Mike goes to prison, which means I won't survive, and I just finished
graduate school and have my whole life ahead of me! I have also been following the condition of
the prisons during the COVID-19 pandemic, and the thought of Mike, who is over the age of 65
and at high risk, living in close confinement with a multitude of other human beings keeps me up
at night.

I hope you will take all of this information into consideration when formulating your ideas
regarding Mike's crimes and his applicable punishment. Mike has already paid a heavy
emotional price and has paid back the company. Mike says he is going to live on my farm
someday in the future as my farmhand. He wants a little cottage with a golf cart where he, my
mom, and Peaches can live peacefully while still being close enough to boss me around daily. I
would greatly appreciate any help you could provide in making this dream come true; the
preservation of my family is the most important thing to me. Thank you kindly for your time.

Respectfully yours,

*Alixandra Bleet*

Alix Bleetstein

Honorable Allison J. Nathan, U.S.D.J.

United States Courthouse

Southern District of New York

500 Pearl Street New York, NY 10017-1312

Re: United States v. Michael Goliszeski, 19-cr-889


Dear Judge Nathan,

I've been Michael's domestic partner for over 15 years.Over those 15 years, I have known Mike to be a devoted partner, father, and friend, who goes out of his way to make the people around him feel loved and comforted. I am 74 years old. Mike is 69. I am on a great deal of medication for my health. ███████ ████████████████████████ I depend on Mike to help take care of me. Mike frequently accompanies me to doctor's appointments and there have been many times when he had to rush me to the hospital. Mike is always there for me.


Mike is a dedicated family man, always willing to help and listen to his children's problems. He talks to his children every day and is especially close to his daughter (who is going through a terrible divorce) and to her two children, one of whom has autism.  Mike has a particularly close relationship with his autistic grandson and has been a tremendous source of moral support for his grandchildren and his daughter as their family deals with a difficult divorce. I also have two daughters and three grandsons who love Mike very much. He adores them too. Mike plays a very active role in the lives of his grandchildren and my grandchildren, taking them to movies, shows, and concerts, going fishing, and going out for meals etc.

Through the many years we have been together, I have
introduced Mike to all of my friends and they have
quickly become his friends too. They all love him for
his warmth and kindness and for his willingness to
always help them out, for example, fixing their houses,
doing repairs etc.


Mike made a mistake. A serious mistake. And that
mistake took a serious toll on both of us. We both went
into deep depression and anxiety. ███████████████████
████████████████████████████████████████████████████
██████████████████████

In order to resolve this mistake and make amends as
best we could, we quickly sold our house and my
apartment and Mike took a huge distribution from his
retirement account. We moved into a small rental
apartment in Long Branch New Jersey. We lost everything
that we built over the years, but we are grateful to
still have each other and our children and
grandchildren and we have learned to appreciate the
simpler life we now lead.


We both attend Tower Hill Presbyterian Church every
week and volunteer at the food bank and the senior
lunch once a month. Mike is employed part-time at the
Tower Hill Presbyterian church. He enjoys the work and
it helps us financially.

I know that Mike has learned a great deal from his
mistakes, and that he would never repeat them.

I will always be here for Mike and continue to support
him. There isn't a day that goes by that we are not
there for each other. My emotional and physical health
depend on Mike's presence and I do not know what I
would do if he were required to serve a period of
incarceration.

Sincerely,


**Marilee Bleetstein**

Christa R. Goliszeski



May 1, 2020

Honorable Alison J. Nathan, U.S.D.J.

United States Courthouse

Southern District of New York

40 Foley Square

New York, NY 10007


Re: United States v. Michael Goliszeski, 19-cr-889 (AJN)


Dear Judge Nathan,

My name is Christa Goliszeski and I am Mr. Goliszeski's daughter. My father is my biggest supporter, my best friend, my rock, my heart, and my inspiration. He is one person I can always count on. I start my day with a call to my father and I end my day with a text. Growing up my father took the leadership and role of both father and mother. People are shocked to hear that I don't have a relationship with my mother and feel sorry for me. However, I quickly remind them that my situation isn't sad, because I had a man who was brave, loving, caring, and devoted to his family. He has stood by me in every situation I've encounter. My father is the guy who can walk into a room and becomes friends with anyone he meets. He welcomes everyone with open arms and treasures everyone he encounters. He is the guy that would give you the shirt off his back. I often hear how lucky I am to have him as a father and when I am told that, I say not lucky, but blessed.

 A few years ago I found out that my two older sisters are not my biological sisters, but half-sisters. My father at young age took on the responsibility of two little girls and adopted them. He has provided, guided, cared, and loved them ever since. When I found this out my love and respect for my father grew even more. Here was a man who took on responsibility for two young children, that weren't even his own, but became his own. My father not only is a family man, but volunteers his time at the local food banks and church events. Growing up my father instilled in us to always be grateful for what you have, but to give back when you can. He does things from the kindness of his heart and not for show or praise.

My father has many qualities and characteristics that many people adore him for and above I stated just a few, but his strongest quality is his strength. I never knew how much strength he truly had until our family had to go through this whole legal situation. The results of my father's actions effected the whole family. Everyone is stressed, worried, and upset. This whole situation has heightened my anxiety and caused me to have depression. I can't fathom the thought of not seeing my father or being able to talk to him every day. The unknown is the scariest part of this whole situation.

Sincerely,

Christa Goliszeski



June 8, 2020

The Honorable Alison J. Nathan, U.S.D.J.
United States Courthouse
Southern District of New York
500 Pearl St.
New York, NY 10007-1312

Re:   *United States v. Michael Goliszeski*, 19-cr-889 (AJN)

Dear Judge Nathan,

I am Mr. Goliszeski's nephew and an attorney admitted to the bar of this Court. I write this letter to share with the Court my continued support, love, and admiration of my Uncle Mike and to ask you for leniency in his sentencing. While I cannot explain and do not understand the actions that led Uncle Mike to be before the Court for sentencing, I can describe to you the person that I knew before those actions and the person that I have come to know since.

I have known Uncle Mike for as long as I can remember. He married my mother's sister when I was very young. As a child, I enjoyed and always looked forward to the time that our families would spend together. He is a second father to me, and his daughters are like sisters. As an adult, I have sought to emulate his work ethic and the example he set as a father. I was always awed by his stories of being a seaman during the Vietnam War and proud of his bravery and service to our country. He taught me so many things growing up from chess to how to fix a leaky faucet. But most importantly, he taught me to love, respect, and care for others. This is why, as a young man, I asked him to be my confirmation sponsor. In short, Uncle Mike was the man I wanted to grow up to be, fun, hard-working, kind, and caring.

Uncle Mike was not just a role model to me, but to many of my friends as well. In college, he was a mentor to many of them. And to this day, when I see them, they still ask about Uncle Mike. Although Uncle Mike and my aunt divorced many years ago, I have continued to maintain a close personal relationship with him. I still consider him to be my uncle and my godfather.

While the actions that bring him before the Court for sentencing are out of character, his actions since have not been. He not only admitted his guilt to the Court, but he admitted it to his family despite the shame he felt. In addition, he sought to make amends for his action. Based on my work experience with similar situations, this is extraordinary! For example, one former employee of my company who pleaded guilty to accepting bribes is currently appealing his conviction more

than nine years after his arrest and has yet to make any restitution. Uncle Mike, on the other hand, admitted his guilt, and sold his beloved home and withdrew significant sums from his retirement savings to make restitution.

I leave it to Uncle Mike's criminal attorney to argue for an appropriate sentence under the law, I speak here as his nephew to plead with Court for leniency in sentencing him given how much he and his family have already suffered. While I'm certain that Uncle Mike will stoically serve any sentence imposed by this Court, I submit that any period of incarceration would serve no purpose other than to punish Uncle Mike's family by taking him away from us in the twilight of his life. This would be especially hard on his autistic grandson Nicholas, who adores his grandfather. Thus, I implore you not to impose any period of incarceration on Uncle Mike.

In closing, although I deplore Uncle Mike's actions that bring him before the Court for sentencing, I want to reiterate that I respect and admire his actions since in acknowledging his wrongdoing and attempting to make things right. I hope that you will take this letter into account in deciding Uncle Mike's sentence.

Respectfully,

Michael S. Davi

# Linda E. Gelfand, Ed. S.

████████████████

April 20, 2020

Honorable Alison J. Nathan, U.S.D.J.
United States Courthouse
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:  United States v. Michael Goliszeski, 19-cr-889 (AJN)

Dear Judge Nathan:

I am pleased to write this letter on behalf of Michael Goliszeski.  I have known Michael personally for the past eight years primarily in social situations with other close friends. I feel that my background as a former school administrator with the Edison Township Public Schools, where I was responsible for hiring many teachers and Child Study Team members, places me in a position to comment about Michael's personal qualities.

Several adjectives come to mind as I think about Michael's personality, attitude and character.  He is kind and caring, optimistic and responsible.  Michael can be relied on whenever the need arises.  He has a strong work ethic and will always step-up to take on additional responsibilities.  I would like to site a few examples of his generosity with his time and dedication to community and those he cares about.

Michael is extremely committed to both his family and community.  He works tirelessly for his local religious church, spending many hours to improve the physical plant as well as adding to the spiritual quality of the organization.  Michael is extremely close with his brother and, even though he does not live in near proximity, makes tremendous efforts to maintain a meaningful relationship with him.  Probably the most signification family relationships are the ones Michael has with his daughters and grandchildren.  He is their "rock" whenever the need arises, providing any and every type of assistance and support that is needed.  Unfortunately one of his daughters has been going through a divorce and Michael has stepped in and provided the emotional support that is so important during this time.  Certainly the most noteworthy family contribution is the one that Michael has made is to his grandson who has been diagnosed with autism. Michael spends countless hours taking him to appropriate activities to enrich his life and

provide some respite for his daughter.   Additionally Michael has attended many fund raising events to raise money for the Autistic community.

Another example of Michael's generosity of time is when a mutual friend recently became widowed.  She was having some difficulty selling her home which she had to do for financial reasons.  Michael stepped in and assisted with needed repairs, painting, and the cleaning out of unwanted items.  He expected and received no compensation. After Michael's assistance the home was sold in a matter of weeks.   I could go on with other examples of Michael's generosity and kind nature including how he lent our family his personal van so that we could take an extensive road trip as a family unit.   However, I believe the point is made that he is a caring and generous person who enriches the lives of his family, friends and community.

I feel certain that Michael Goliszeski will continue to be an asset to his family and the community in which he lives and works.  If you have any further questions, please do not hesitate to contact me.

Respectfully yours,

*Linda Gelfand*

Linda Gelfand, Ed.S

B-14

Jeffrey J. Conway



May 12, 2020

Honorable Alison J. Nathan, U.S.D.J.

United States Courthouse

40 Foley Square

New York, NY 10007


Re: United States v. Michael Goliszeski, 19-cr-889 (AJN)

Dear Judge Nathan

I have known Mr. Michael Goliszeski as a good friend and father figure for close to three years now.  I was both troubled, surprised and hurt to hear about his recent case, as he has always been someone I have admired, loved and cared for.  It is for this reason, I volunteered to write this letter of reference for Mr. Michael Goliszeski.  I understand the seriousness of this matter, however I will stand by Mr. Michael Goliszeski, no matter the ruling, but I hope and pray the court will show some leniency.

Mr. Michael Goliszeski and I met close to three years ago when I started dating his daughter.  He and I both quickly formed a bond, I never had with my own father.  As our friendship grew, he became someone who I quickly learned to trust and lean on when I needed or wanted some fatherly advice.  He has helped me through tough situations, such as, when I sold my house and had to move.   He also assisted me with projects such as, installing ceiling fans, building a fire pit, teaching me how to install an electrical outlet and many more.  As I stated before, I never had a father figure around in my life to help with projects or to give advice.  To me Mr. Michael Goliszeski is my family, he always goes above and beyond to help and assist me anyway he can.  He is one of the genuinely nicest, loving people I know next to my own Mother.

In addition to our friendship, Mr. Michael Goliszeski is the backbone of his family.  He loves and supports his girls any way he can.  They idolize him for his strength, courage, and guidance. The relationship he has with his daughters is amazing, one that I've never seen between father and daughters. While we were all surprised to hear about his misconduct, it comes with no surprise to all of us that Mr. Michael Goliszeski has accepted responsibility and shown strong remorse for his actions.  By choosing to move forward, Mr. Michael Goliszeski has become closer to his family and God. If there is one thing we all learned from this situation, is that even super hero's make mistakes.

Sincerely,

Jeffery J. Conway

# MICHAEL DiPEDE

### CERTIFIED PUBLIC ACCOUNTANT

Member of the American Institute of CPAs • Member of the N.J. Society of CPAs

May 5, 2020

Honorable Alison J Nathan, U.S.D.J
United States Courthouse
Southern District of New York
500 Pearl St
New York, NY 10007-1312

RE:    United States v. Michael Goliszeski, 19-cr-8889(AJN)

Dear Judge Nathan,

I am writing this letter on behalf of Michael Goliszeski, who I have known for the past 12 years. My relationship was initially on a professional level, as a CPA, but has progressed to also be on the personal level.

During this time that my relationship has grown with Michael Goliszeski he has displayed many qualities from a professional and personal standpoint. He always was willing to help and assist others in any way possible. On a few occasions, Michael Goliszeski would make various inquires for his friends and employees about finances, he would always absorb any cost attributable to this. He is a man of truth, honesty, and integrity. In all my years of knowing Michael Goliszeski, he was respectful of others, always kind and thoughtful to those around him. Michael Goliszeski was very aware of my families love of sports and baseball, at various times he would provide my family with nostalgic items of our love of sports, he did this periodically. He was always inquiring of my children and family.

During this time of prosecution, I have noticed on multiple occasions in talking with him, how Michael was stressed and depressed. I could see he was battling and struggling to maintain his composure, not only for himself, but also what it has done to his family.  The burden of this event affects him more for what it has done to his family, then himself, since he cares deeply for family.

It is my sincere hope that the court takes this letter into consideration at the time of sentencing. Despite the current case, I still believe Michael Goliszeski to be an honorable individual and a good human being. My relationship will not change, and I will stand by him.

Sincerely,

Michael DiPede, CPA

Tel ███████████ • Fax (███████████ • ███████████

Honorable Allison J Nathan U.S.D.J.
United States Courthouse
Southern District of New York
500 Pearl St.
New York, NY 10007–1312

United States versus Michael Goliszeski  19 – ct – 889 (AJN)

Dear Judge Nathan,
I have known Michael Goliszeski for 35 years. In my long time of knowing Michael he has always
been a family man and open hearted to the underdog and has helped many people with his generosity
and labor. I have worked with him on various jobs helping others. There is also a time he help me with
my motel In Point Pleasant Beach New Jersey when an unnamed hurricane in December 1992 flooded
my motel with 3 feet of water, he was right alongside me, helping me get my business back up for the
1993 season. Agin Two churches I was involved in and in the process of going on mission, Michael
gave generous donations to St. James AME and Great Bay Gospel and it was greatly appreciated. There
was a young carpenter named Lou who was out of work and his father asked Mike to help him and
Mike went out of his way to get him a job. He has done the same to at least two others I know of
Joseph and Ryan on two different occasions. There were many times I've called him to go out and he
couldn't, because he was donating time, helping to Coach a Little League or Soccer. Believe me there
are many other like these. It's these situations that reminds me of how good a person he is to others. I
have great faith in him and I know he has a good heart. With his making restitution and the company
being satisfied. I pray that this is ending for Michael. Seeing him going through this tremendous
financial loss and emotional depressions, it affects his mental and physical health as well as us around
him. I pray for you having to judge these situations. I hope you can show leniency in this case as I
know Michael in a different light. I thank you for your time reading this.

Sincerely

Richard Toledo

May 21, 2020

Honorable Alison J. Nathan, U.S.D.J.
United States Courthouse
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:  United States v. Michael Goliszeski, 19-cr-889 (AJN)

Dear Judge Nathan:

The highest accolade for a man or woman is being a true friend.  Mike
Goliszeski epitomized true friendship.   Several years ago my son was working
through severe emotional/psychological issues.  Without being asked, Mike
offered him a job.  This enabled my son to feel comfortable and valued, which
is what he needed to get through this most difficult time.

Most recently my husband was very ill, the severity unbeknownst to us.  Mike
was kind and caring, even escorting him to the men's room in an elegant
restaurant when we were out to dinner and waiting for him for over an hour.

These are just two minor examples of Mike's innate kindness and empathy.

With love, support and gratitude.

Respectfully yours,

Rochelle Lerch
Retired Teacher of 31 years

May 7, 2020

Honorable Alison J. Nathan, U.S.D.J.
United States Courthouse
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:  United States v Michael Goliszeski, 19-cr-889

Dear Judge Nathan,

My name is Vered Helfgott I was diagnosed with multiple sclerosis 20 years
ago. My beloved husband of 36 years died five years ago I was left
emotionally and financially shattered. Only a handful of people extended
their helping hand and a few stepped up Michael and Marilee were there for
me. I have known Michael for 15 years his kindness compassion and generosity
are humbling. When my husband died I was left with a large mortgage and a
house that needed a lot of work in order to sell it. Michael took charge and
repaired everything at no charge. He spent countless hours doing work in
order for my house to sell.

When it was time for me to move to an apartment they stepped up to help me.
Michael's kindness and gentle manner and his compassion is very rare. I will
stand by Michael and I will never abandon this incredible person no matter
what. I'm very lucky to call Michael and Marilee friends.

Sincerely,

Vered Helfgott

  Gmail

**Kristen Santillo <ksantillo@gelbersantillo.com>**

---

## Michael J. Goliszeski
1 message

To: ███████████████████████████                          Wed, Jun 3, 2020 at 10:40 PM

Your Honor,

      I am Anthony Goliszeski. Michael Goliszeski is my brother. This letter is difficult to write to you. I fear my attempt to tell you who my brother truly is will fall short.

I am a retired police detective of twenty-seven years so I see this through two lenses, a man who loves his brother and a police officer who honors the law. I could give you a long story about our childhood and young lives but I feel what really matters is the future and who Michael is today.

      I was eleven and Michael was thirteen when our father abandoned his family.  Mike did his best to fill that void.

He put himself through trade school, started cleaning toilets and worked his way up to building manager. Along the way he volunteered for the Navy, served in Vietnam, was injured and honorably discharged. He returned home to take care of our mother and younger brother.  He helped get me my first job in a gas station before I also volunteered for service in the Army.  During his life he always did what he could to help others, he supported and took care of our Mother until her death in 2008, to include seeing her through her alcoholism and sobriety. For the rest of her life she remained sober under his care.

      Until a year or so ago Michael had never been in any sort of trouble much less with the law. He raised three daughters virtually by himself. He coached his daughter's soccer team for years and to this day some of the players still consider him family.

      The last year has been trying for our family. Michael has done all he can to make restitution and cooperate. He has lost almost everything and is deeply ashamed of what he has done.

He fears going to prison, something he knows nothing about. He fears for his children and grandchildren.  Being the man that he has always been he accepts what may come but on his behalf, I ask you to show him mercy. My brother is redeemable and will spend the rest of his life making up for his mistake.

Sincerely,
Anthony Goliszeski

# EXHIBIT C

Michael J. Goliszeski



May 12, 2020

Honorable Alison J. Nathan, U.S.D.J.
United States Courthouse
Southern District of New York
40 Foley Square
New York, NY 10007

Re: United States vs Michael Goliszeski, 19-cr-889 (AJN)

Dear Judge Nathan,

I am writing this letter so that I may provide you with an understanding of who I am.
Throughout my life, I have tried to work hard, set a good example, and care for others more
than myself.  My actions which bring me before this Court and for which I take full responsibility
do not represent or define the person I am. The shame and disappointment in myself I feel for
my actions will be with me everyday for the rest of my life.

During my nineteen and a half years working for Rexton Realty Company I ran the day-to-day
operations under the direction of John Engel.  From the day I first interviewed with John Engel
in 1998, I knew John and I shared a chemistry between the two of us, and we would work well
together.   I accomplished a lot during my time at the company, including several million dollars
worth of tenant leasehold work in addition to capital improvement projects such as building
facade repairs, passenger elevator modernization projects, and various other work necessary to
maintain a functional and profitable portfolio.  I took great care and pride in making sure that
all of the tenants were happy and the buildings ran like well-oiled machines.  I also took great
care to treat the maintenance workers in the building with respect.

While the majority of the work that I did for Rexton over nearly two decades was legitimate, I
deeply regret that I also enriched myself by giving some work to my companies that I should
not have, and by creating fictitious and inflated invoices.  It pains me greatly that I let John and
the company down by my actions.  I am sorry that the workers in the building who had looked
up to me before were disappointed in me.  It was very painful and humiliating to be forced to
leave a company I considered to be a huge part of my identity for decades in disgrace.  It made
me rethink everything about who I was and who I want to be.

I did not realize the pain I would cause my family, myself, and everyone who was impacted by
my actions.  I diligently instilled in my daughters, and grandchildren, the importance of living
their lives with respect, love, and an appreciation for the blessings they experience everyday.

The love and support I have received from my family, and true friends, has shown me that I cannot let one mistake define who I am.

The physical, emotional, and personal impact this matter has taken on me has humbled me. I have always been a believer in Jesus Christ. This experience has opened my eyes and brought me closer to Christ. I have enjoyed attending the First Presbyterian Church in Red Bank, N.J. for the past seven years. I attend services each week, I volunteer to work charity and fund-raising events, once a month I volunteer and work at the Lunch Break Food Bank in Red Bank,  N.J. I did not plan on working for the church as an employee, it never entered my mind. In February 2019 I received an email blast from the church to all church members posting a part time custodial position. I applied for the position and was hired for the position. I continue to work at the church.  I enjoy working there, the income helps me pay my bills. It is a much more simple, humble job, but it brings me happiness to work with my hands and see the results, and I like being surrounded by the church community. It is a good reminder of what is really important to me, and that it is not money or things.

I have done everything I can to make Rexton Realty Company whole financially. I have sold my home in Red Bank, N.J., personal belongings, and took distributions from my IRA account to settle the civil lawsuit in the amount of ████████. This cost me almost everything Marilee and I have built together, but it was worth it to try to make amends for my mistakes.  I worry about our financial stability and future much more than I ever thought I would at this stage in my life, but I know it is the right thing to do to give back everything that I took that was not rightfully mine.  I know now that, while before I had things that I wanted, all I need is my family and friends, an honest, humble job, and a modest place to live.  I will never again make the mistake of doing anything dishonest to get more than I need.

I will not have the opportunity to privately meet with you to express my remorse and let you see the person I am. I ask that you take into consideration what I have shared with you. It is a strange thing that this horrible thing I did has made me a better person, but I do hope that I have a chance to continue to live a modest life, contribute to my community and care for my family.

Respectfully yours,


Michael Goliszeski